UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHRISTINE YOUNG,          )
                                   )
       Plaintiff,           )
                                   )
     vs.                   )        Case No. 4:13CV2160 CDP
                                   )
CAROLYN W. COLVIN,       )
Commissioner of Social Security,   )
                                 )
       Defendant.        )

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision denying

Christine Young's application for disability insurance benefits under Title II of the

Act, 42 U.S.C. §§ 401 et seq. Section 205(g) of the Act, 42 U.S.C. §§ 405(g),

provides for judicial review of a final decision of the Commissioner. Young

claims she is disabled because of lupus, diabetes, fibromyalgia, high blood

pressure, high cholesterol, high liver enzymes, and arthritis. Because I find that

the decision denying benefits was supported by substantial evidence, I will affirm

the decision of the Commissioner.

## Procedural History

Young filed her application for benefits on November 11, 2010. She alleges

disability beginning April 19, 2009. On August 13, 2012, following a hearing, an

ALJ issued a decision that Young was not disabled. The Appeals Council of the Social Security Administration (SSA) denied her request for review on September 3, 2013. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the Administrative Law Judge

### Application for Benefits

In her application for benefits, Young stated that she was born in 1965 and has a high school education, plus one year of college. (Tr. 129, 163-64). She is 5'2" tall and at the time Young applied for benefits, she weighed 124 pounds. (Tr. 163). However, at the time of the hearing Young weighed 165 pounds. (Tr. 31). In her disability report, Young reported that she stopped working not only because of her condition, but because "the company was doing poorly due to the economy." (Tr. 163). Young also completed an Adult Function Report in conjunction with her application for benefits on December 14, 2010. (Tr. 174). In it, she described her daily activities as getting her children up for school, taking a bath and medication, eating meals, watching television, napping, letting the dog outside, and visiting with her family before going to bed. She takes care of her husband and two children by cooking, doing laundry, and taking them to doctor's appointments. She feeds her pets and lets them outside. Her husband, children,

and friends help her cook, clean, do laundry, and go shopping.  Young claims that she can no longer work, clean house, shop, drive, do yard work, go for long walks, dance, ride a bike, go to happy hour, host parties, and open jars.  She wakes up in pain and with night sweats, and has a hard time lifting her legs, getting out of the tub, and using the bathroom.  She makes sandwiches and frozen dinners on her own and full meals with the help of her family.  It takes Young about two hours to do one to two loads of laundry and two to three hours to clean one room of the house.  Young needs help dusting baseboards, mopping, and scrubbing floors.  She goes out one or two times a week, but never alone due to pain and dizzy spells.  Her husband usually takes her shopping.  Young can pay bills, count change, handle a savings account, and use a checkbook.  She reads, attends church weekly, talks on the phone, and visits with friends.  Young does not need reminders to go places.  Young stated that she gets along with others and follows instructions "very well."  She has trouble lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, and using her hands.  Young can walk five minutes before needing to rest for 10 minutes.  She has a hard time gripping and her hands are always cold and tingly.  Young gets along with authority figures and handles stress "very well."  Young fears "that I'll never have a normal life and do the things with my children I used to be able to do.  Afraid of dying and leaving

them alone." (Tr. 174-80).

Young also completed a disability report in conjunction with her appeal on April 4, 2011. In it, she reported having pneumonia and gallbladder surgery since she last completed a disability report. Young also responded affirmatively to the question asking whether she had any new limitations, stating that she was "very depressed." Young reported that she "can handle [her] personal needs." (Tr. 190-97).

<u>Medical Records</u>

Young reported to DePaul Health Center on June 27, 2008, for swelling on her jaw. She thought she had been bitten by a spider. Examination revealed no lymphadenopathy or jugular venous distention, and her chest, heart, abdomen, and extremities were normal. The examining physician, Imran A. Hanafi, M.D., diagnosed Young with local cellulitis and continued her course of antibiotics along with anti-inflammatories. (Tr. 438-39).

On June 28, 2010, Young went to DePaul Health Center complaining of generalized weakness, fatigue, and neck and groin lumps. Young reported weight loss, muscle cramps, night sweats, occasional chest pain and shortness of breath, and tiredness over several months. She noticed lumps on her neck and in her groin the month before. Young denied any diarrhea, constipation, blood in her stool,

back pain, neck pain, headache, vision problems, weakness in her extremities, or trouble walking. Physical examination revealed posterior cervical lymphadenopathy with groin lymphadenopathy with bilateral inguinal lymphadenopathy and bilateral axillary lymphadenopathy. A CT of the chest was done which showed bilateral lymphadenopathy and splenic enlargement suggesting lymphoma. The assessment was generalized weakness and muscle cramps with fatigue, generalized lymphadenopathy with night sweats, and splenomegaly. Attending physician Radhika Jaladi, M.D., noted, "Rule out lymphoma. Obtain oncology consultation. Consider lymph node biopsy . . . Also, check HIV." Dr. Jaladi also assessed leukocytopenia and thromnocytopenia, smoking and alcohol, uncontrolled diabetes mellitus, abnormal liver function tests "likely related to her generalized hemat/oncologic process," and deep venous thrombosis prophylaxis. (Tr. 253-54). An x-ray of Young's chest taken the same day was normal. (Tr. 248).

The next day Young reported to Giancarlo A. Pillot, M.D., for an oncology consultation. Dr. Pillot was asked to see Young for a lymphadenopathy. Young reported a severe, 100 pound weight loss over the past four to five months, along with decreased energy and easy fatigability. Young denied fevers but claimed she had drenching sweats. Dr. Pillot noted that Young was positive for diabetes, with

poor recent control and non-adherence to therapy for financial reasons. Dr. Pillot's examination revealed a small posterior occipital node, shotty cervical lymphadenopathy, a few axilla LN palpable, and firm bilateral groin nodes, one centimeter or less. Otherwise Young's examination was within normal limits. Dr. Pillot assessed lymphadenopathy and an enlarged spleen, with lymphoma as a possible differential diagnosis, as well as inflammatory disorders, and recurrence of cervical and vulvar carcinoma. Dr. Pillot ordered a biopsy of the most accessible lymph node, imaging scans, and tissue diagnosis. (Tr. 250-52).

Young had a follow-up visit with Dr. Pillot on July 8, 2010. She reported still feeling somewhat poorly. Dr. Pillot noted that the biopsy of Young's lymph node revealed only a reactive lymphadenopathy with follicular hyperplasia. Flow cytometry did not note any obvious malignancy or primary hematologic issue. Young's remaining lab results showed nonreactive HIV tests, a normal IgM level, HgbA1c of 13.0, white blood cell count of 3.5, hemoglobin of 12.2, and platelets at 76,000. Coagulation studies were normal, her uric acid was low, but the hepatitis panel was negative. Her urinalysis showed large amounts of glucose. Dr. Pillot also reviewed Young's imaging tests again and noted gallstones but no obvious mass, a normal ultrasound of the pelvic and transvaginal regions, a normal CT scan of the abdomen, and bilateral axillary lymphadenopathy of the chest.

Examination was within normal limits except for shotty lymphadenopathy noted in the axilla and neck. Dr. Pillot determined those lymph nodes were all less than one centimeter in size and fairly mobile. Dr. Pillot concluded that Young had a cluster of symptoms of "unclear etiology." He noted that Young's lymph node biopsy did not support the possibility of lymphoma, and her other scans did not support a recurrence of cervical or vulvar carcinoma either. Dr. Pillot recommended a PET scan to evaluate the character of her lymph nodes and to rule out any obvious bony lesions. He also advised rechecking her CBC, CMP, and LDH to rule out iron, B12, or folate deficiencies, checking her ANA to screen for lupus, and checking her TSH to screen for thyroid disease. The possibility of a bone marrow biopsy was also discussed. Young was advised to make an appointment with her primary care physician and to follow up with him in one week. (Tr. 221-23). Young's ANA test taken the same day was positive at a titre of greater than 1:1,280 (Tr. 218). Her liver enzymes were also elevated. (Tr. 218).

Young presented to the emergency room at DePaul Health Center on July 25, 2010, for body pain, headaches, nausea, and vomiting. She reported that she

had been diagnosed with lupus by Dr. Poetz two weeks ago.[1]  Young complained

of a sudden onset of lower thoracic and lumbar pain radiating to the right side,

with severe and constant cramping.  Young's physical examination revealed no

tingling, focal weakness, or loss of consciousness, but was positive for myalgias,

back pain, nausea, and vomiting.  Her examination was otherwise within normal

limits.  Young was diagnosed with leukopenia, back pain, and diabetes mellitus

uncontrolled.  (Tr. 330-34).  The next day, Young was discharged and had a bone

marrow biopsy, which revealed a low white blood cell count, hypercellular

marrow with erythroid hyperplasia and dyserythropoiesis, and increased stainable

iron.  The flow cytometry was negative for lymphoma or acute leukemia.  (Tr.

224-26).

On August 5, 2010, Young went back to Dr. Pillot to discuss her test results.

Dr. Pillot noted that Young had been to see her primary care physician, but had not

yet had an appointment with a rheumatologist.  Dr. Pillot reviewed Young's lab

data with her, which included the positive ANA test, a negative protein

electrophoresis and immunofixation, a polyclonal increase in immunoglobin, a

---

[1]There is no record in the file showing that Dr. Poetz made a diagnosis of lupus at that time.  However, there is a treatment note from Dr. Poetz dated July 23, 2010, which states that Young was "diagnosed with lupus one week ago."  This note, however, does not state who actually made the diagnosis.  (Tr. 419).

normal T4 and B12, minimally increased TSH, and a mild elevation of liver enzymes. Dr. Pillot also informed Young that her bone marrow biopsy did not reveal any obvious lymphoma, leukemia, myeloma, or obvious myeloproliferative disorder or malignancy, although it did show some degree of dyserythropoiesis and a hypercellular marrow of approximately 95%. Young's physical examination was generally within normal limits, with no change in her musculoskeletal systems and only some shotty lymphadenopathy in the axilla, which appeared less notable and palpable than before. Her back and spine were nontender to percussion and palpation, her extremities showed no edema, erythema, ecchymoses or cyanosis, and her neurologic exam revealed no focal weakness. Dr. Pillot's impression was mild leukopenia and thrombocytopenia in the setting of lymph nodes and slight elevation of the spleen, positive ANA, and "multiple other medical issues as noted." Dr. Pillot believed that Young's positive ANA test suggested that she had a rheumatologic disorder, although he still considered myelodysplasia a possible diagnosis. He suggested a follow-up visit in a couple of weeks. (Tr. 218-20).

Young saw Dr. Poetz on July 23, 2010, and August 23, 2010, for pain in her back and legs, fingertips turning blue and white, vomiting, loss of appetite, nausea, diarrhea, fatigue, heartburn, and sleeplessness. It was noted on her records that she was diagnosed with lupus on July 10, 2010, and that she was awaiting

examination by a rheumatologist.  (Tr. 418-19).

On September 16, 2010, Young went to Barnes Jewish Hospital complaining of severe diarrhea and pain.  Young reported a throbbing headache, slurred speech, nausea, vomiting, diarrhea, loose stool with blood, and "smelling tin."  Her diagnosis of lupus was noted as "questionable."  Physical examination upon admission revealed two palpable lymph nodes in the right neck, a soft abdomen with normal bowel sounds, some tenderness on the ankles and knees but no swelling, effusion, or erythema at the joints, and multiple bruise-like lesions on her thighs, buttocks, and left elbow.  She had no neurological deficits, was intact to light touch, had a normal gait and motor strength, and good insight and judgment.  Extensive lab work was ordered, and the CT scan of the chest, abdomen, and pelvic region was remarkable for enhancing, enlarged bilateral axillary lymph nodes.  In her discharge summary, Benjamin Voss, M.D., elaborated on Young's questionable lupus diagnosis by stating that her multiple symptoms were thought to fit several different processes.  For this reason, Young was advised to follow up with the rheumatology clinic to discuss a diagnosis and treatment options.  However, it was noted that Young's symptoms improved during her hospital stay.  Her pain was alleviated by Percocet.  Dr. Voss prescribed Young lisinopril, Zocor, insulin, and Percocet and instructed her to follow a

diabetic diet. She was discharged on September 23, 2010. (Tr. 280-84).

Young reported to the Washington University rheumatology department on October 13, 2010, as instructed by Dr. Voss for treatment of an autoimmune disease. Young's symptoms were fatigue, weight loss, night sweats, fevers, rash, dry mouth, diabetes, early menopause, headaches, and nausea. It was noted that Young was diagnosed with lupus at DePaul Hospital in June of 2010 "with no lab confirmation of that diagnosis." Physical examination revealed no tenderness in Young's joints, no edema, no palpated lymph nodes, and a reddish brown rash on her upper and lower extremities. Young's tests from her recent hospital stay revealed likely lymphadenopathy. The treating physician, Richa Gupta, M.D., noted that "many of her symptoms are consistent with lupus." Young was prescribed prednisone and advised to return for a follow-up visit in three months. (Tr.310-13).

On October 29, 2010, Young returned to DePaul Health Center for high blood sugars in the 300-500 range. Her physical examination was within normal limits. The attending physician diagnosed Young with hyperglycemia. Young was told to resume her normal dose of Novolog with each meal and discharged the same day. (Tr. 387-403). A liver biopsy performed on November 30, 2010, revealed that Young had chronic grade one hepatitis. (Tr. 320). Another liver

biopsy performed December 13, 2010, showed no evidence of autoimmune hepatitis and the presence of lesional tissue, either an adenoma or an FNH. (Tr. 318-19). A CT scan of Young's abdomen on January 6, 2011, showed an enhancing lesion in the left lobe of the liver was stable, cholelithiasis, and no new findings since December. (Tr. 415).

On January 27, 2011, Young returned to DePaul Health Center, this time complaining of chest pain, fever, shortness of breath, generalized malaise, back pain, joint pain, nausea, and cough. Her physical examination was normal, and the EKG showed normal sinus rhythm and heart rate. Her discharge diagnosis was chest pain, pneumonia, hypertension, and diabetes mellitus. She was prescribed levofloxacin, continued on her existing medications, and discharged the next day. (Tr. 604-21).

Young returned to the Washington University rheumatology department for a follow-up visit on February 14, 2011. Young reported that she had seen a "marked positive response" in her symptoms since taking predisone, so much so that she tapered down her dose more than recommended. Young stated that she had less fatigue, more energy, and fewer sweating episodes, although she reported ongoing arthralgias in the joints of her hands. Young denied any serositis symptoms, oral sores, new rashes, or loss of appetite. Her sclerae were clear, and

there were no palpable lymph nodes in the axillae or groin, no signs of active synovitis, and no skin breakdown. Dr. Gupta believed that Young's pancytopenia had improved remarkably on predisone and proteinuria was minimal. Because of Young's weight gain, he recommended tapering down her predisone dosage and advised her to return in three months. (Tr. 632-33).

Young presented to Mercy Hospital on March 12, 2011, with epigastric pain. She complained of abdominal pain, nausea, and vomiting, but denied chest pain, diarrhea, fevers, or shortness of breath. Her examination was normal except for tenderness in the right upper quadrant and epigastric area. She denied any current rash and arthralgias with typical flare. A CT scan taken of Young's abdomen revealed a distended gallbladder and cholelithiasis, with no significant wall thickening or pericholecystic inflammation. On discharge, the attending physician diagnosed abdominal pain, nausea with vomiting, diabetes mellitus, diarrhea, hypertension, lupus, and thrombocytopenia. Young was prescribed omeprazole, continued on her existing medications, and discharged on March 14, 2011. (Tr. 551-604).

Young went back to the Washington University rheumatology department on July 1, 2011, for a follow-up visit and "reevaluation of lupus." In patient history, Dr. Gupta noted that Young had a history of systemic lupus

erythematosus, evidenced by a positive ANA, DS-DNA, and RNP, and symptoms of arthralgias, fatigue, weight loss, pancytopenias, transaminitis, mild proteinuria, rash, generalized small lymphadenopathy, and small splenomegaly. It was also noted that Young had developed depression and fibromyalgia secondary to her diagnosis and gained weight due to her medication. Young reported generalized myalgias, arthralgias, whole body pain, a low mood, and crying spells. She was given Lyrica, which Young stated helped her "immensely." The numbness and tingling in her feet and pain in her lower extremities had decreased remarkably, and Young had no new rashes. Young denied any oral sores, facial rashes, chest pain, shortness of breath, abdominal pain, altered bowel movements, or urinary symptoms. Her physical examination showed no oral ulcers or facial rash, clear sclera, no cervical lymphadenopathy, regular heart rate and rhythm, clear lungs, normal bowel sounds, and several tender points during her musculoskeletal exam. Dr. Gupta noted that Young's DS-DNA test results were much improved, but that her high inflammatory markers, elevated ALP, and pancytopenias were "worrisome" and warranted further evaluation. Young was advised to return to the clinic in four months. (Tr. 629-31).

Young reported to the emergency room at Mercy Hospital for an overnight stay on November 9, 2011, for abdominal pain and nausea. Young denied lower

abdominal pain or tenderness, fever, or dysuria. Her physical examination was normal and revealed no abdominal tenderness. A CT scan of the abdomen revealed cholelithiasis with mild distention of the gallbladder, which was relatively unchanged from the March 12, 2011, exam. The attending physician diagnosed abdominal pain and advised Young to follow up with her rheumatologist. (Tr. 456-61).

Young reported to the Washington University rheumatology department for a follow-up visit on November 11, 2011. Young reported weight gain, feeling weak, and low mood. Her physical examination was within normal limits except for several tender points in her musculoskeletal system. Dr. Gupta believed Young's thrombocytopenia was her most "worrisome" symptom of lupus. Young was continued on Lyrica for her pain syndrome and depression and prescribed Ambien for insomnia. She was told to return to the clinic in four months. (Tr. 626-27).

In connection with Young's application for benefits, Dr. Poetz completed a medical source statement - mental on May 15, 2012. He stated that he began treating Young on July 23, 2010, and her most recent visit with him was on April 19, 2012. He diagnosed Young with major depressive disorder and assigned her a GAF score of 62. Dr. Poetz indicated that Young had depressive symptoms of

sleep disturbance and decreased energy.  He believed she had mild restrictions in the activities of daily living and moderate difficulties in maintaining social functioning.  According to Dr. Poetz, Young had deficiencies of concentration, persistence, or pace which would result in the frequent failure to complete tasks in a timely manner.  Dr. Poetz opined that Young was moderately impaired in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, sustain an ordinary routine, work with others without being distracted, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently of others.  (Tr. 673-75).

<u>Testimony</u>

During a hearing held before the ALJ on June 22, 2012, Young testified that she last worked as an administrative assistant for a flooring contractor, which required her to do filing, payroll, delivery, and floor sales.  She left that job because she became ill and business was slow.  Young stated that she could not go back to that job because she has a hard time driving due to muscle fatigue in her legs and arms, she cannot lift flooring displays, and her arms cramp up from typing.  She also has pain in her joints and back hurts if she sits in one position for

more than 15 or 20 minutes and cannot wear high heels because of hip pain. Young believed she had joint pain and muscle fatigue for about a year before she saw a doctor. She continues to have joint pain, which comes and goes and varies in frequency depending upon the week. Walking, pushing, driving, sitting, and squatting seem to trigger the joint pain. On a good day, Young can walk for about 10 or 15 minutes, and on a bad day she can only walk for five minutes before she has pain in her hips, back, and knees. Young could have one to three good days a week. She has trouble standing in one place and has to move around frequently. Her lower back pain continues to worsen. Young's muscle fatigue makes her muscles tighten up and feel limp. She has trouble opening jars, taking a shower or bath, and putting on body lotion.

Young feels a little depressed, down, and angry on an average day. She tries to do some household chores to keep moving, but it takes her longer. She can't wash more than 10 dishes at a time, and she has to sit on a stool to cook. She sits down to clean the kitchen table and has trouble walking down the basement stairs to do laundry. Young can dust the coffee table while sitting down in front of it, but it's too hard to run the vacuum cleaner most days. She also has trouble taking care of her personal hygiene. Young's back pain makes it difficult to wash her hair and shave her legs. Her depression makes her feel like she doesn't care,

and her hair falls out.  She doesn't want to be around people and has become

antisocial.  Her antidepressant medication worked at first, but doesn't seem to

anymore.  She feels angry about being depressed and lashes out at her family and

pets.  She gets mad at strangers and yells at other drivers when she is driving.  She

has never been referred to a psychiatrist or psychologist.

Young's medications make her dizzy, nauseous, and give her diarrhea.  She

also has blurred vision.  Young gained weight while on prednisone.  She takes

Lyrica for her fibromyalgia, which eases her pain.  Young watches television and

reads.  (Tr. 31-51).

Vocational expert Tracy Young also testified at the hearing.  The ALJ asked

the vocational expert if there were any jobs that a hypothetical individual with

Young's education, training, and work experience could perform if that individual

were limited to light work primarily dealing with things rather than people and

occasionally related to co-workers and supervisors.  The vocational expert

responded that such an individual could perform Young's past work as a payroll

clerk and bookkeeper.  The vocational expert further testified that if the exertional

level were reduced to sedentary but all other factors remained the same, an

individual with those limitations would still be able to work as a bookkeeper and

payroll clerk, as these jobs allow for some changing of positions from standing to

walking.  If the additional limitation were added that the individual could not

sustain the attention, concentration, and persistence on a work task for two hour

segments over the course of an eight hour workday, then the vocational expert

testified that the individual would be unable to perform Young's past work or any

other work.  (Tr. 54-64).

## Legal Standard

A court's role on review is to determine whether the Commissioner's

findings are supported by substantial evidence on the record as a whole.  Gowell

v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a

preponderance, but is enough so that a reasonable mind would find it adequate to

support the ALJ's conclusion.  Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir.

2000).  As long as there is substantial evidence on the record as a whole to support

the Commissioner's decision, a court may not reverse it because substantial

evidence exists in the record that would have supported a contrary outcome, id., or

because the court would have decided the case differently.  Browning v. Sullivan,

958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is

substantial, a court considers "evidence that detracts from the Commissioner's

decision as well as evidence that supports it."  Singh v. Apfel, 222 F.3d 448, 451

(8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir.

1999)).  Where the Commissioner's findings represent one of two inconsistent

conclusions that may reasonably be drawn from the evidence, however, those

findings are supported by substantial evidence.  Pearsall v. Massanari, 274 F.3d

1211, 1217 (8th Cir. 2001) (internal citation omitted).

To determine whether the decision is supported by substantial evidence, the

Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th

Cir. 1980).

Disability is defined in social security regulations as the inability to engage

in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve months.  § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity.  If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner

must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

Id. at 1322. When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding. Casey v. Astrue 503 F.3d 687, 696 (8th Cir. 2007). However, the ALJ retains the responsibility of developing a full and fair record in the non-

adversarial administrative proceeding.  <u>Hildebrand v. Barnhart</u>, 302 F.3d 836, 838

(8th Cir. 2002).

**The ALJ's Findings**

The ALJ issued his decision that Young was not disabled on August 13,

2012.  He found that Young had the severe impairments of systemic lupus

erythematosus, fibromyalgia, obesity, depression, and anxiety.   The ALJ found

that Young retained the residual functional capacity to perform light work, except

that she should perform work dealing with things rather than people, and that

Young could occasionally relate with coworkers and supervisors.  In fashioning

Young's RFC, the ALJ determined that her impairments could be expected to

produce some of her alleged symptoms; however, he concluded that Young's

statements concerning the intensity, persistence, and limiting effects of those

symptoms were of "limited credibility" and supported only to the extent they were

consistent with his RFC.   The ALJ relied on the vocational expert's testimony to

determine that Young was able to perform her past relevant work as a payroll clerk

and bookkeeper.  Therefore, he concluded that Young was not disabled.

**Discussion**

Young contends that the ALJ's RFC was not based upon substantial

evidence because the ALJ did not provide a narrative statement linking the

evidence to the RFC. RFC is defined as "what [the claimant] can still do" despite

his "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When

determining whether a claimant can engage in substantial employment, an ALJ

must consider the combination of the claimant's mental and physical

impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The Eighth

Circuit has noted the ALJ must determine a claimant's RFC based on all of the

relevant evidence, including the medical records, observations of treating

physicians and others, and an individual's own description of his limitations.

McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citing Anderson v.

Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). The record must include some medical

evidence that supports the RFC. Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.

2000).

Young argues that the RFC is not supported by some medical evidence

because there is no opinion from a physician addressing any limitations caused by

her physical impairments. Young also contends that the ALJ improperly

discounted her treating physician's opinion regarding her mental limitations.

Here, the ALJ properly evaluated Young's RFC after consideration of all the

relevant evidence, including the medical evidence. To the extent Young

complains about the absence of a medical source statement regarding her physical

limitations, "[i]t is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). There was no indication that Young was prevented from providing a medical source statement. She never sought an extension of time to obtain one or asked the ALJ to hold the record open after the hearing until one was provided. If Young thought the ALJ needed this evidence to formulate the RFC, it was her burden to provide it. More importantly, a medical source statement was not required as the ALJ's RFC was properly supported by the medical evidence of record. Here, the ALJ extensively analyzed Young's medical records and concluded that they did not support the degree of limitation claimed by Young. As noted by the ALJ, there is some indication in the record that Young's diagnosis of lupus was questionable as other diagnoses were possible, and there is some discrepancy in the records as to who first diagnosed Young with lupus and when.[2] Despite Young's positive ANA test and elevated liver functioning test in July of 2010, Young's examination by Dr. Pillot was within normal limits except for shotty lymphadenopathy noted in the axilla and neck, which were all less than one centimeter in size and fairly mobile. Young's

---

[2]Although Young apparently told DePaul Health Center's emergency room in July of 2010 that Dr. Poetz had recently diagnosed her with lupus, Dr. Poetz' treatment notes do not actually reflect that he made the diagnosis.

physical examination during her hospital visit on July 25, 2010, also revealed no tingling, focal weakness, or loss of consciousness. Similarly, Dr. Pillot noted during her August 25, 2010, examination that Young's results were generally within normal limits, with no change in her musculoskeletal systems and only some shotty lymphadenopathy in the axilla, which appeared less notable and palpable than before. Young's back and spine were nontender to percussion and palpation, her extremities showed no edema, erythema, ecchymoses or cyanosis, and her neurologic exam revealed no focal weakness.

When Young presented at Barnes Jewish Hospital in September of 2010, she had two palpable lymph nodes in the right neck, some tenderness on the ankles and knees, and some bruising, but no swelling, effusion, or erythema at the joints, no neurological deficits, and she was intact to light touch, had a normal gait and motor strength, and good insight and judgment. Young's symptoms of diarrhea and pain improved during her stay, and her pain was alleviated by percocet. That October, Dr. Gupta noted that Young was diagnosed with lupus at DePaul Hospital "with no lab confirmation of that diagnosis," and physical examination revealed no tenderness in Young's joints, no edema, no palpated lymph nodes, and a reddish brown rash on her upper and lower extremities. Young was given prednisone, which markedly improved her symptoms. During her February 14,

2011 follow-up visit with Dr. Gupta, Young stated that she had less fatigue, more energy, and fewer sweating episodes and had even decided to taper down her dosage. Young had no serositis symptoms, oral sores, new rashes, or loss of appetite, and there were no palpable lymph nodes in the axillae or groin or signs of active synovitis. Dr. Gupta believed that Young's pancytopenia had improved remarkably on predisone and proteinuria was minimal. Although he found Young's high inflammatory markers, elevated ALP, and pancytopenias "worrisome" during her July 1, 2011, visit, Dr. Gupta also noted that her DS-DNA numbers were much improved and that her use of Lyrica had decreased the numbness and tingling in her feet and pain in her lower extremities "immensely." Similarly, Dr. Gutpa's examination of Young during a follow-up visit on November 11, 2011, was also within normal limits except for several tender points in her musculoskeletal system.

After reviewing this evidence and evaluating Young's credibility, the ALJ determined that Young's physical impairments did not result in significant limitations to her RFC. This finding is supported by substantial evidence on the record as a whole. Young's claimed limitations are not supported by the medical records as none of Young's doctors ever expressed an opinion that Young's symptoms were disabling. To the contrary, the medical evidence reveals that

Young's symptoms improved substantially with treatment and were not severe enough to preclude her from any gainful activity. While it is true that her symptoms did not fully resolve during the relevant time period and that Young undoubtedly experienced some pain, "the real issue is how severe that pain is." Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991). Here, the ALJ properly concluded that Young's allegations of disabling pain were not consistent with the medical records and accordingly fashioned an RFC consistent with Young's physical abilities to perform the requirements of light work. It was not error for the ALJ to reach this conclusion, and his decision is entitled to deference.

Young also complains that the ALJ did not properly consider Dr. Poetz' opinion regarding her depression when fashioning her RFC. "'It is the ALJ's function to resolve conflicts among the various treating and examining physicians.'" Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting Vandenboom v. Barnhart, 421 F.3d 745, 749-50 (8th Cir. 2005). The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)). However, the opinion of the treating physician

should be given great weight only if it is based on sufficient medical data. Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate need to evaluate record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

Here, the ALJ properly formulated Young's RFC only after considering all of the relevant evidence, including Dr. Poetz' mental medical source statement. The ALJ discussed Dr. Poetz' opinion when formulating Eberhart's RFC, including Dr. Poetz' belief that Young's depression resulted in mild restrictions to her activities of daily living and moderate difficulties in maintaining social functioning, with some deficiencies of concentration, persistence, or pace which would result in the frequent failure to complete tasks in a timely manner. Dr. Poetz also opined that Young was moderately impaired in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a

schedule, sustain an ordinary routine, work with others without being distracted, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently of others.  The ALJ discounted Dr. Poetz' opinion because he is a family practitioner, not a psychiatrist, and his opinion was not supported by his medical records.  There were no supporting medical records or diagnostic tests or findings attached to his opinion, and the medical records from his office do not indicate that he even treated Young for depression, much less for depression of the severity indicated in his medical source statement.[3]  The ALJ also properly discounted Dr. Poetz' opinion as inconsistent with the recommended course of treatment, as he never referred Young to a mental health specialist.  See Davis v. Barnhart, 197 Fed. Appx. 521, 522 (8th Cir. 2006) (ALJ may properly consider lack of treatment in determination of benefits).  He gave some weight to the opinion of Dr. Poetz to the extent consistent with the medical evidence of record, but he was not required to include every limitation set out by Dr. Poetz in his RFC determination.  For example, the ALJ adopted some of the limitations set out by Dr. Poetz regarding Young's social

_____

[3]While the medical records indicate that Young complained of – and was treated for – depression by the Washington University rheumatology clinic, Dr. Gupta noted on July 1, 2011, that Young's symptoms were helped "immensely" by Lyrica, and she was continued on that prescription for her pain and depression in November 11, 2011.

functioning when deciding that Young should be limited to light work dealing

with things, not people, and have only occasional interaction with coworkers and

supervisors.[4]  However, he rejected those limitations which were inconsistent with

the record as a whole, and it was not error for him to do so.  The opinion of the

treating physician should be given great weight only if it is based on sufficient

medical data.  Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that

where a treating physician's notes are inconsistent with his or her RFC

assessment, controlling weight is not given to the RFC assessment); Chamberlain

v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (holding that opinions of treating

doctors are not conclusive in determining disability status and must be supported

by medically acceptable clinical or diagnostic data) (internal quotation marks and

citation omitted).  Here, Dr. Poetz' conclusory opinion regarding Young's mental

limitations is not entitled to great weight as it is inconsistent with his treatment

notes and the other, uncontraverted objective medical evidence of record. See

Prosch v. Apfel, 201 F.3d at 1013 (an ALJ may "discount or even disregard the

opinion of a treating physician where other medical assessments are supported by

better or more thorough medical evidence, or where a treating physician renders

---

[4]This limitation also took Young's own testimony into account, as she told the ALJ that she gets angry and doesn't want to be around people.

inconsistent opinions that undermine the credibility of such opinions.") (internal

quotation marks and citations omitted); Cox v. Barnhart, 471 F.3d 902, 907 (8th

Cir. 2006) (holding that an ALJ may give a treating doctor's opinion limited

weight if it is inconsistent with the record); Kirby v. Astrue, 500 F.3d 705, 709

(8th Cir. 2007) (an ALJ is entitled to give less weight to the opinion of a treating

doctor where the doctor's opinion is based largely on the plaintiff's subjective

complaints rather than on objective medical evidence) (citing Vandenboom, 421

F.3d at 749).

The ALJ did not simply adopt a light work RFC wholesale. Instead, he

formulated Young's RFC after careful consideration of all the relevant evidence,

including the opinion of Dr. Poetz. Here, there is substantial evidence in the

record as a whole to support the ALJ's determination that Young was capable of

performing light work, with some social restrictions. Because the ALJ's RFC

determination is supported by some medical evidence and is properly based on the

record as a whole, the ALJ did not substantially err in formulating Young's RFC.

Young also argues that the ALJ did not properly assess her credibility

under Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984). When determining

the credibility of a claimant's subjective complaints, the ALJ must consider all

evidence relating to the complaints, including the claimant's prior work record and

third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010); Polaski, 739 F.2d at 1322. The absence of objective medical evidence may also be considered, and the "ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole." Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006) (citing Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000)). An ALJ is not required to explicitly discuss each Polaski factor. Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011). The "credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). Consequently, courts should defer to the ALJ's credibility finding when the ALJ explicitly discredits a claimant's testimony and gives good reason to do so. Buckner, 646 F.3d at 558.

Here, the ALJ combined his credibility analysis with his review of the medical records and his RFC determination and gave good reasons for concluding that Young's testimony was of "limited credibility." In doing so, he properly relied upon the lack of objective medical evidence in the record supporting her statements of disabling pain, the lack of any medical opinion that Young was

significantly limited by her physical impairments, and the lack of any medical evidence that Young was limited in her capacity to walk, stand, or use her hands and fingers to the degree she claimed.   See Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (While an ALJ may not discount allegations of disabling pain solely on the lack of objective medical evidence, it is a factor the ALJ may properly consider when determining a claimant's credibility).  With respect to Young's mental impairments, the ALJ appropriately noted the lack of any referral to, or treatment by, a mental health professional.  See Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (ALJ appropriately discredited claimant's allegations of disabling pain by relying, in part, on claimant's lack of treatment).[5]   While acknowledging that Young had "stressors" in her life, the ALJ concluded that these events did not contribute to mental impairments severe enough to preclude her from all work.  The ALJ also considered Young's testimony regarding her daily activities, nothing that she is able to do some household chores.  See Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) ("Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations.") (internal citation omitted).  In discounting Young's credibility, the ALJ further

---

[5]As previously discussed, he properly discounted Dr. Poetz' medical source statement regarding Young's depression.

relied upon the inconsistency in Young's alleged assertion of disability and her disability report, in which she admitted that she stopped working not only because of her disabling condition, but also because the company she worked for was "doing poorly due to the economy." He also pointed out the inconsistency in Young's claimed alleged onset date of April 19, 2009, and the fact that Young never sought any ongoing medical treatment until more than a year later in June of 2010. Given these inconsistencies in the evidence as a whole, the ALJ could properly discredit Young's subjective statements regarding her pain and the nature and severity of her claimed limitations. See Goff, 421 F.3d at 792. As a result, the ALJ did not err in evaluating Young's credibility. See Wildman v. Astrue, 599 F.3d 959, 966 (8th Cir. 2010) (ALJ is not required to discuss every piece of evidence, and the failure to cite specific evidence does not indicate that it was not considered). Because substantial evidence on the record as a whole supports the ALJ's credibility determination, I will affirm the decision of the Commissioner.

## Conclusion

Because substantial evidence in the record as a whole supports the ALJ's decision to deny benefits, I will affirm the decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

affirmed.

A separate Judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of September, 2014.